THE CHICAGO & NORTHWESTERN RAILWAY COMPANY VS. LANGLADE COUNTY and others.

*January 13 — January 30, 1883.*

*Constitutional Law — Towns and counties — Taxation — Officers de facto.*

1. The legislature may change the boundaries of a county containing more than 900 square miles of territory without first submitting the question to a vote of the people of such county.

2. Though, under sec. 22, art. IV, of the constitution the legislature may confer, and, by sec. 670, R. S. has conferred, upon the several county boards power to set off, organize, vacate and change the boundaries of the towns in their respective counties, yet the legis-

The Chicago & Northwestern R'y Co. vs. Langlade County and others.

lature may, by direct action, divide a county into towns and provide for their organization.

3. Such towns are mere *quasi*-corporations and an act providing for their organization is not a special law for *incorporating* any town within the meaning of subd. 9, sec. 31, art. IV, of the constitution. Nor is such act a private or local law within the meaning of sec. 18 of that article. *Cathcart v. Comstock, ante,* p. 590.

4. The "system of town and county government" which, by sec. 23, art. IV, of the constitution is required to be uniform, is the plan or scheme by which the town and county are to be governed, and does not include the method adopted in any case for organizing a town or county and bringing it into the established system.

5. Ch. 7, Laws of 1881, changing the boundaries of Langlade county, dividing it into towns and providing for their organization, provided that none of such towns should be changed or vacated except by a majority vote at an annual town meeting, and that the amount of money to be raised by taxation in such towns for all purposes and the amount to be raised in the county for county buildings, should be limited, for five years, to a certain sum in each year. *Held,* that, assuming such provisions to be invalid, they were not so connected with the other portions and the primary object of the act as to invalidate the whole.

6. The same act provided for the appointment by the governor of all county officers in said county, except the chairman and members of the county board, such appointees to hold their respective offices for the time designated and until their successors were elected and qualified. Assuming that such suspension of the right of the people of the county to elect their own officers was invalid, and that the appointments made by the governor were invalid, it is *held,* that the *offices* were properly created and existed *de jure,* and that the persons appointed thereto, having entered upon the duties of such offices, were *officers de facto,* whose official action cannot be questioned collaterally.

APPEAL from the Circuit Court for *Langlade* County.

The case is thus stated by Mr. Justice CASSODAY:

" This action is brought to set aside alleged taxes attempted to be imposed on the lands of the plaintiff in *Langlade* county in the year 1881. Two grounds are charged in the complaint as the basis of the action. The first is that the legislation which provided for the incorporation of towns in

that county and for the organization of the county is unconstitutional, and therefore the persons assuming to exercise the taxing power had no jurisdiction or authority, and their attempted imposition of taxes is utterly void.   The second is that if there was such jurisdiction the assessment was void because it was made contrary to legal rules of appraisement. The trial court held against the plaintiff upon the first ground stated, and for the plaintiff upon the second ground stated, and hence ordered a reassessment, and the tax debt legally liquidated to be paid as a condition of relief, but dismissed the complaint so far as it proceeds upon the first ground of action stated, and judgment was entered accordingly.    From that order and judgment the plaintiff has brought this appeal, and claims judgment according to the prayer of the complaint.

" The legislation thus complained of is, in substance and effect, as follows: Ch. 114, Laws of 1879, purported to change the boundaries of the counties of Shawano and Oconto, and to create the counties of Marinette and New. The first eleven sections defined the boundaries and provided for the organization of Marinette county.    Secs. 12, 13, and 14, among other things, provided that all the remaining portion of the county of Oconto included within the boundaries named should constitute and be known as the county of New, which was thereby attached to and made a part of the county of Shawano for all county and judicial purposes until it should appear to the secretary of state, from a census duly taken, that said county of New had a population of 1,000, when said county should be organized by the election of county officers, as in other counties of this state; and provided also for a division of the property and liabilities of the respective counties, and that all tax certificates on lands embraced within the county of New be assigned to Shawano county, and by it held in trust for the county of New until the same should be organized, and then to be turned over to

it, and that as soon as the county of New should contain the requisite population the secretary of state should give public notice of an election for all county officers, to be held and conducted at the time and in the manner provided by law for the holding of general elections.

" By ch. 19, Laws of 1880, the name of the county of New was changed to *Langlade*. Chapter 247, Laws of 1880, was enacted to correct and fix the boundaries between *Langlade* and Shawano, and to repeal such portions of secs. 12 and 13, ch. 114, Laws of 1879, as conflicted therewith. Ch. 7, Laws of 1881, entitled ' An act to change the boundaries of the counties of Shawano, Oconto, and *Langlade*, and to create and perfect the county of *Langlade*, and to establish certain towns therein,' went into effect February 19, 1881. This act newly defines the boundaries of *Langlade* so as to include two new townships from Shawano — towns 30 of ranges 11 and 12 — and excludes six towns — 31, 32, and 33 of ranges 13 and 14 — embraced in the boundaries prescribed by the former act, and declares these six townships to be detached from *Langlade*, and together with twelve sections of township 31 of range 15 — detached from Oconto — to be attached to Shawano county. Secs. 3 and 4 read as follows:

" ' Sec. 3. The said county of *Langlade* is hereby organized and established with all the rights, powers, and privileges by law granted and possessed by other counties of this state, and subject to all the general laws of the state prescribed for the government of such counties, except as hereinafter provided.

" ' Sec. 4. Within ten days after the passage and publication of this act, the governor shall appoint, in and for *Langlade* county, all county officers, except the chairman and members of the county board, and the said officers so appointed shall, within fifteen days after the first meeting of the county board of supervisors of said *Langlade* county, duly qualify and enter upon the duties of their several

offices, and shall, except the county judge and superintendent of schools, hold such offices until the first Monday in January, 1883, and until their successors shall be elected and qualified. The county judge and superintendent of schools shall hold their offices until the first Monday in January, 1882, and until their successors in office shall be elected and qualified. Such officers shall, for the above-named terms, receive the following salaries per annum: County clerk, $600; county treasurer, $600; county judge, $100; county superintendent of schools, $300; district attorney, $300. All other officers shall receive as compensation the fees prescribed by law and no other.'

"Sec. 5 fixed the boundaries and divided the territory of *Langlade* county into six towns, to go by the names of Rolling, Norwood, Antigo, Polar, Gagen, and Carpenter, and provided that they should have all the powers and privileges conferred by general laws upon other towns of this state, provided that in Antigo, Polar, Gagen, and Carpenter there should be no greater amount of taxes levied or raised by either of said towns for all purposes than $1,500 a year for the ensuing five years, except that nothing therein should affect the powers of said town boards in relation to state and county taxes. Sec. 6 provided that none of the towns named should be changed or vacated except by a majority vote at an annual town meeting. Sec. 7 fixed the place for holding the first annual town meeting in each of said towns. Sec. 8 fixed the time and place for holding the first meeting of the county board, and that the same should fix the amount of and approve the bonds of the county officers, with proper sureties, locate the county seat, provide offices for county officers, and transact such other business as might be necessary to complete the organization of the county. Sec. 9 prohibited the county board from raising a larger amount than $1,000 per year for county buildings for the five ensuing years. Sec. 10 directed the county board to provide for

settlement between the town of Langlade (which embraced substantially the same territory as the county when first created) and three towns organized by the board of Shawano, legalized by said ch. 247, Laws of 1880. Sec. 11 attached the county to the tenth judicial circuit, and directed two terms therein each year, at times to be fixed by the circuit judge and at a place to be fixed by the county board. Sec. 12 repealed so much of all acts or parts of acts as conflict with the provisions of that act.

"Soon after the passage of ch. 7, Laws of 1881, the governor, in pursuance of said sec. 4, appointed all the county officers for said county named therein, who duly qualified as such county officers, and they or their successors have ever since that time discharged the duties of their respective offices. Upon the passage of the act, and in the spring of 1881, town meetings were held in pursuance thereof in each of said several towns, and town officers elected in each of said towns, who duly qualified, and they or their successors have since continued to discharge their duties as such town officers. Rolling and Norwood each contained thirty-six square miles, Antigo 252, Polar 216, Gagen 420, and Carpenter 480, and all were composed substantially of wild lands. There were inhabitants in each of these several towns, some of them, however, consisting of a single settlement. In Gagen eight persons voted, six of whom had resided there for a year or more, and two were temporarily there, and there were no other residents. In Carpenter there were five persons who voted, and there were no other residents therein entitled to vote in 1881."

*Wm. F. Vilas*, for the appellant.

For the respondent there was a brief by *G. W. Latta* and *Sloan, Stevens & Morris*, and oral argument by *Mr. Sloan*.

CASSODAY, J. Since *Langlade* county contained more than 900 square miles of territory, the legislature had power to

change its boundaries without first submitting the question to a vote of the people, as required by sec. 7, art. XIII, of the constitution. The territory of the county was divided into six towns, and a name and certain prescribed limits given to each, and each declared to have all the powers and privileges conferred by general laws upon other towns of this state, except as therein provided. The act also fixed the several places for holding the first annual town meeting in each of the towns, and also the time and place for holding the first meeting of the county board of supervisors in the county. And it further appears that the several town officers in each of said towns were elected at the time of holding annual town meetings in the spring of 1881. We do not think these provisions were "*incorporating any town*," within the meaning of subd. 9 of sec. 31 of the amendments to article IV of the constitution, for the reasons given at length in *Cathcart v. Comstock, ante*, p. 590, and which need not be here repeated. Not being within the prohibition of that subdivision, it clearly was not within the prohibition of sec. 32 of that amendment, for that provides for the enactment of general laws only for the transaction of such business as is prohibited by said sec. 31.

In construing the ninth subdivision of sec. 31, Mr. Justice TAYLOR says, in *Smith v. Sherry*, 50 Wis., 213: "If the ninth subdivision of the amending section 31 had been omitted altogether, it is probable that the amendments would have been construed as not applicable to municipal corporations at all; but, however that might have been, it is now very clear that the legislature in adopting the seventh subdivision and the people in ratifying the same, in connection with the ninth subdivision of the section, did not intend that the seventh subdivision should extend to towns and villages. If the general terms used in the seventh subdivision had been intended to prohibit the legislature from granting corporate powers and privileges to towns and villages by special or private laws, as well as to corporations of a private nature,

there would have been no necessity for adding the ninth sub-division, which in express terms prohibits the incorporation of any town or village, or to amend the charter thereof, by any special law. . . . The object of the amendment [subd. 9] was to prevent special legislation and to promote uniformity, so far as possible, in the laws governing the incorporated towns and villages in the state."

We find nothing in that opinion, however, which authorizes the inference that the amendment in question was intended as a prohibition against legislation dividing the territory of a single county into towns and for the organization of the same. Such towns are at most but mere *quasi*-corporations, and not *incorporated towns* within the meaning of that amendment. *Cathcart v. Comstock, supra.* Of course, the act in question is special, in that it is confined to a particular fraction of the state, and not to territory generally throughout the state; but it is not the kind of special legislation there prohibited.

Nor do we think it was a private or local law within the meaning of sec. 18, art. IV, of the constitution, for reasons given at length in *Cathcart v. Comstock, supra.* See, also, *State of Nebraska v. Page,* 12 Neb., 386.

It is true that the constitution nowhere expressly authorizes the legislature to divide the territory of a county up into towns and then provide for the organization of the same; neither does it expressly authorize them to confer that power upon the respective boards of supervisors of the several counties. But in construing the constitution of the state we are to remember that the legislature is not acting under a delegation of powers, but only under a limitation of powers. It is a maxim too well established to require the citation of authority, that the state legislature may exercise all legislative power not delegated to the general government, nor restricted nor reserved to the people by the state or national constitution. The fixing of the boundaries of counties and

dividing the same into towns, and providing for the organization thereof, are certainly legislative functions.

It is true, the constitution expressly provides that "the legislature *may* confer upon the boards of supervisors of the several counties of the state such powers of a local, legislative, and administrative character as they shall *from time to time* prescribe." Sec. 22, art. IV. This authority for conferring such powers upon county boards, contains within itself an express reservation of the same powers to be exercised from time to time in prescribing other and different laws. Whether such express reservation was essential to the resumption of such powers by the legislature, seems to be unnecessary here to consider. Under the authority thus expressly given to the legislature, they had, prior to the act in question, conferred upon the several county boards the special power to set off, organize, vacate, and change the boundaries of the towns in their respective counties, designate and give names thereto, fix the time and place of holding the first town meeting therein, etc. Subd. 1, sec. 670, R. S. The section seems to apply more particularly to counties already organized. At all events, the powers therein conferred upon the boards were subject to the conditions mentioned in the statute. Of course, the legislature enacting that statute could not thereby take away nor abridge the powers of subsequent legislatures to legislate upon the same subject.

It is true, the legislature had power to establish but one system of town and county government, and that was to be as, nearly uniform as practicable. Sec. 23, art. IV, Const. But even that does not require absolute uniformity. *Cathcart v. Comstock, supra,* and cases there cited. Except in so far as the act in question substantially interferes with the unity or uniformity of the system, it cannot be regarded as repugnant to this constitutional provision. Is this interdiction so rigid as to preclude the legislature by direct action from

changing the boundaries of counties, or creating new counties or dividing the territory thereof into new towns, and then providing for their organization, so that, when organized, they shall belong to the one established and uniform system?

It is the one system, which is to be as nearly uniform as practicable. It is that which is to be protected against legislative encroachment. This system, which is to be thus guarded, is nothing more nor less than the plan or scheme by which the town and county are to be governed. Within the limits of the constitution, this plan or scheme of governing either town or county may be changed by the legislature without any interference with the other. The mere fact that the legislature, in a given case, prescribes a particular method of organizing new towns and bringing them into the one established system, does not necessarily imply that the plan or scheme of governing such new towns, after they are thus brought into the system, is to be any different from that in other towns. The incipient steps leading towards organization should not be mistaken for the more advanced stages. A town implies inception and progression, as well as completed organization. The same is true of a county. Induction into the family of local governments is quite a different thing from exercising the functions of such government after having been thus inducted. The one involves action prior to reaching the system, the other implies action after becoming a constituent part of it. The unity and uniformity required apply to the organization, when completed, rather than the methods adopted to bring about such organization. The parts of a machine when put together, and its mode of operation, may be substantially like another machine, yet the method of producing the parts, and the inventors and manufacturers thereof, may be very unlike. In a limited sense the same may be true in the process of creating and organizing towns and counties, and their subsequent operations.

The authority for such organization must be obtained directly or indirectly from the legislature. The argument here is that such authority may be obtained indirectly through a county board of supervisors, but cannot be granted directly by the legislature itself. To warrant such a position the constitutional restriction should be plain and undoubted. We find no such explicit prohibition of direct action on the part of the legislature in prescribing the boundaries of new counties, dividing their territory into new towns, and then providing for their organization. We must conclude, therefore, that the new towns designated were properly created, and upon the election and qualification of the requisite officers therein, in the spring of 1881, became properly organized. This being so, each of the towns, on being so organized, had a town board of supervisors, and under and by virtue of the general statutes the several chairmen of such boards constituted the county board of supervisors. Sec. 663, R. S. Whether the county was organized prior to the act in question is not necessary here to consider.

Counsel for the plaintiff claims that there were in the territory of *Langlade* county, outside of the two towns of Rolling and Norwood, taken from Shawano county,— three towns established by the county board and legalized by the legislature; and he insists that if that action of the county board was invalid, then there was still the one town of Langlade, previously existing, referred to in the tenth section of the act in question. If that was so, then it would follow from the decision in *Cathcart v. Comstock, supra,* that the supervisors of such single town constituted the supervisors of the county. But, however that may be, the third section of the act in question declared that "the said county of *Langlade* is hereby organized and established with all the rights, powers, and privileges by law granted and possessed by other counties of this state, and subject to all the general

laws of the state prescribed for the government of such counties, *except as hereinafter provided.*" Did this exception render the act nugatory? We have already determined that it was not void by reason of fixing the boundaries of the county, nor by reason of dividing the same up into towns and providing for the organization thereof. Nor do we think that the restriction as to the amount of taxes to be raised in four of the towns was such as to defeat the organization of such towns, whether the same was valid or invalid. The same may be said in regard to the restriction as to the amount of money to be raised in the county for the five ensuing years, and as to vacating and changing the boundary of the towns. Assuming these several restrictions to be invalid, yet they are not so connected with the other portions, and the primary object of the act, as to necessarily invalidate the whole. *State v. Tuttle*, 53 Wis., 45; *Cathcart v. Comstock, supra.* The determination of the validity of those particular clauses of the act, therefore, are not essential to the decision of this case.

But the most serious objections to the validity of the act are the provisions of the fourth section. By that section the governor was required within ten days after the publication of the act to appoint all county officers in and for *Langlade* county, except the chairman and members of the county board, and the officers so appointed were severally to qualify and enter upon the duties of their respective offices within fifteen days after the first meeting of the county board. The act also required the officers so appointed to hold their respective offices for the time therein designated, and until their successors should be elected and qualified, and also fixed the compensation of county clerk, county treasurer, county judge, county superintendent, and district attorney, and provided that the other county officers should receive the fees prescribed by law and no other. The term of office of the county judge and superintendent was to expire in January,.

The Chicago & Northwestern R'y Co. vs. Langlade County and others.

1882, and the others in January, 1883. The constitution provides that "sheriffs, coroners, registers of deeds, and district attorneys shall be chosen by the electors of the respective counties, once in every two years, and as often as vacancies shall happen. . . . The governor may remove any officer in this section mentioned, giving such officer a copy of the charges against him and an opportunity of being heard in his defense." Sec. 4, art. VI. It also provides that "all county officers whose election or appointment is not provided for by this constitution, shall be elected by the electors of the respective counties, or be appointed by the boards of supervisors or other county authorities, as the legislature shall direct. . . . All other officers whose election or appointment is not provided for by this constitution, and all officers whose offices may hereafter be created by law, shall be elected by the people, or appointed, as the legislature may direct." Sec. 9, art. XIII. It also provides that " the legislature may declare the cases in which any office shall be deemed vacant, and also the manner of filling the vacancy where no provision is made for that purpose in this constitution." Sec. 10, art. XIII. The statutes provide for the filling of vacancies in the offices of sheriff, coroner, register of deeds, district attorney, and county superintendent, by appointment from the governor. Sec. 967; R. S.; ch. 178, Laws of 1879.

Counsel for the defendant contend that the county officers for *Langlade* county have been created since the adoption of the constitution; and hence that under the last clause of sec. 9, art. XIII, of the constitution, above quoted, it was competent for the legislature to direct the filling of the same by appointment of the governor. We think, however, that that clause has no reference to any of the kind of offices provided for in the constitution, but only to other kind of offices thereafter created. It may be that it was not competent for the legislature to suspend the right of the people to fill the county offices named with persons of their

own choice until January, 1883.  It may be that such suspension was in violation of the several sections of the constitution referred to.  Whether it was or not, seems to be unnecessary to decide upon this appeal.  Assuming that such appointments for the length of time designated were unauthorized, yet it does not necessarily follow that the officers so appointed were mere usurpers, acting without any color of authority.  As stated, the towns were duly organized, each having a full complement of town officers, including a town board of supervisors.  The several chairmen of such town boards constituted a valid county board of supervisors.  The county was organized and established with the rights, powers, and privileges designated.

Counsel urge with much force that there was no such organization and establishment, *except* with officers to be appointed.  A fair construction of the act, however, implies that such organization and establishment were with the requisite county *offices*, to be *subsequently* filled by such appointment.  In other words, the offices were properly created, and the illegality, if any, consisted in an attempt to fill them by appointment for the period indicated.  Since there were the requisite county offices in the county *de jure* to be filled, can we hold that because such offices were filled by appointment instead of an election, that therefore the official acts of such officers in levying and collecting the taxes in question were mere nullities?

It is to be remembered that this is not an action to try the title of the persons so appointed to the offices; nor is it an action directly calling in question their right to such offices. On the contrary, the nature of this suit is such as only to call in question their respective titles to the offices collaterally.  The extent of such inquiry is abundantly illustrated by the decisions of this court.  Perhaps there is no case more analogous to the one at bar in principle than *State v. Bloom*, 17 Wis., 521.  To appreciate the force of that decision it is

necessary to state that by ch. 162, Laws of 1861, the boundaries of the judicial circuits therein mentioned were defined, and the two circuit judges residing in Portage and Trempealeau counties, respectively, were thereby declared to be the judges of the eleventh and twelfth circuits, and providing for an election of circuit judges in the sixth and seventh circuits, respectively, in April, 1862, who should take their offices in January, 1863. By that division the judge of the sixth circuit, who resided at Trempealeau, and which included Jackson county, was transferred to the new eleventh circuit, which included Trempealeau but not Jackson county, which remained a part of the sixth circuit. The governor was also expressly authorized and empowered by the act to appoint some suitable person to the office of circuit judge in the sixth and seventh judicial circuits, so constituted, to fill the vacancies created by the change in the boundaries thereof; and the act prescribed that such *judges so appointed* should each hold his office until January, 1863, and until his successor was elected and qualified; and the governor thereupon made such appointments. The right of the person so appointed in the sixth circuit, Hon. I. E. Messmore, was contested by *quo warranto*, and he was ousted of his office. It was there, among other things, decided that when a new judicial circuit is created the first judge thereof must be elected by the people, and that prior to such election there was no vacancy in the office to be filled by executive appointment, and that where the act creating the new circuit makes no special provision for an election of the judge, the election should be held under the general provisions of the statute. *State v. Messmore*, 14 Wis., 164. Prior to such ouster, and while Mr. Messmore, as such judge, by virtue of such appointment, was holding the May term of the circuit court for Jackson county, one William N. Bloom was indicted in said court, and tried, convicted, and sentenced therein to the state prison for five years by Messmore, acting

as such judge. After Messmore had been ousted of the office, Bloom applied for release from prison on *habeas corpus*, on the ground that, at the time of the indictment, trial, conviction, and sentence, Messmore was not a judge of the court, but a mere usurper acting without color of authority — another person being at the time judge of said circuit court for Jackson county. But this court held that the sentence was, nevertheless, valid and binding in the law. *State v. Bloom*, 17 Wis., 521. This was put upon the ground that, although the appointment was without authority, yet that the appointee was a *de facto* judge. That case is quite similar in principle to the one before us, and in our opinion is decisive of it.

In support of the same principle and illustrated by a variety of cases, we cite the following decisions of this court: *Tolle v. Stone*, 1 Pin., 230; *Lask v. U. S.*, 1 Pin., 77; *State v. Williams*, 5 Wis., 308; *In re Boyle*, 9 Wis., 264; *Dean v. Gleason*, 16 Wis., 1; *Laver v. McGlachlin*, 28 Wis., 364; *State v. Bartlette*, 35 Wis., 287; *State v. Goldstucker*, 40 Wis., 124; *Sprague v. Brown*, 40 Wis., 612. Under the statute and constitutional provisions cited, no one will deny that the governor has the right, under certain circumstances, to appoint county officers. It may be that the governor had the right in the first instance, and for the purpose of temporary organization of *Langlade* county, to appoint the county officers in question. However this may be, we are clearly of the opinion that they were officers *de facto*, and hence that their official action cannot be questioned collaterally in a suit like this.

*By the Court.*— The order and judgment of the circuit court is affirmed.