STATE EX REL. BLOOMER, Respondent, vs. CANAVAN and others, Appellants.

*December 10, 1913—January 13, 1914.*

*Municipal corporations: Commission form of government: Statutes construed: Abolishment of existing boards: Restoration: Vacancies in office: Appointments: Delay: Term of office: De facto officers: Removal of policeman: Constitutional law: Option laws: Partial invalidity: Classification of cities: Qualifications for office: Exclusion of saloonkeepers.*

1. Under ch. 448, Laws of 1909, providing for the governing of cities by commissions, and declaring that upon the reorganization of a city under that act the council of three should "have all the powers and perform the duties had and exercised by the mayor and council and the several administrative and executive officers, boards and commissions of such city," the effect of the adoption of the act by a city was to put an end to an existing fire and police commission.

2. Ch. 387, Laws of 1911, which amended said act of 1909 so as to provide for the continued existence of boards and commissions created under laws theretofore in force in any city which should adopt the commission form of government, had the effect to create or restore a fire and police commission which had previously been abolished in such city, but not to reinstate in office the former members of such commission.

3. The act of 1911 provided for the selection of one member of such board, in cities already organized under the commission form of government, by the city council from their own number at

their first regular meeting after the act was passed, and it was the evident intent that the board should be organized and proceed to carry out its functions promptly after such act of 1911 was passed.

4. Practically, in such a case, there were vacancies in the board to be filled as soon as the act of 1911 became effective, and as to the members other than the one to be chosen from the council the mayor had power to fill such vacancies, under sec. 959—40, Stats., which, not being inconsistent with the new scheme of government under the act of 1911, was continued in force by virtue of sec. 925m—303.·

5. The fact that the mayor and council did not act promptly in such case in naming the members of such board, did not invalidate their acts when done at a later period.

6. Even if the terms for which members of such fire and police board were appointed were not legal, yet, the authority existing to make the appointments for as long a time as they were made, the appointees accepting and acting as such were at least *de facto* officers, and their action in trying charges against and removing a policeman was valid.

7. Even if said acts of 1909 and 1911 were unconstitutional there would still be a *de jure* office under the previously existing statute, and the former incumbents having ceased to act, the new appointees would be *de facto* officers just the same, with the power of removal.

8. The provision of ch. 448, Laws of 1909, allowing the electors of a city to determine by vote whether the city should elect to come under the law, is valid.

9. The further provision by which a city at the end of six years might, by vote of its electors, abandon the commission form of government and go back to its old charter, was evidently not a determining factor with the legislature, and, whether valid or not, does not affect the validity of the remainder of the act.

10. The fact that cities of the first class are excluded from its operation does not render the act unconstitutional. The existing classification of cities having been approved as valid, the power to legislate for one or more of the classes is quite plenary, although no reason can be advanced why the legislation should be confined to the class or classes included.

11. The city officers provided for under the commission form of government are not constitutional officers, and a statute which prescribes a certificate of good moral character from a certain number of electors as a qualification for candidacy for such offices, does not offend against the constitution.

12. The provision of ch. 448, Laws of 1909, excluding saloonkeepers from the office of mayor or councilman, violates no constitutional right, since those officers have to do with the granting of licenses for the sale of liquor, the making of ordinances and regulations relative to the liquor traffic, and the enforcement of state laws in reference thereto—matters which might conflict with the interests of saloonkeepers.

APPEAL from a judgment of the circuit court for Winnebago county: GEORGE W. BURNELL, Circuit Judge. *Reversed.*

*Henry D. Ryan,* for the appellants.

For the respondent there was a brief by *J. Elmer Lehr,* attorney, and *Horace B. Walmsley* and *Gilbertson, Lehr, Reitman & Kiefer,* of counsel, and oral argument by *Mr. Walmsley.*

BARNES, J.    Acting under ch. 448, Laws of 1909, the city of Appleton adopted the commission form of government. The reorganization was perfected on April 19, 1911. Ch. 448, Laws of 1909, was amended by ch. 387, Laws of 1911, which act became effective on June 19, 1911. On December 20, 1911, the chief of police suspended the relator, a police patrolman, for drunkenness and other misconduct and reported such action to the mayor. On January 3, 1912, the mayor appointed four persons as members of the board of police and fire commissioners of the city to serve until the first Monday in May following, which appointments were confirmed. The council selected the mayor to act as a fifth member of the commission. These appointees took the necessary steps to qualify. On January 15, 1912, the relator demanded an immediate hearing on the charges preferred against him. Such hearing was held on January 20th before the commission constituted as indicated, the relator appearing in person and by counsel and offering such evidence as he desired to submit. The commissioners found that the charges were sustained and removed the relator, who

thereupon sued out a writ of *certiorari* to review the action of the board in making the removal.

In the petition for the writ it was set forth that the board was without power, jurisdiction, or authority to act in the matter and that its action was a nullity because the board of police and fire commissioners in office prior to April 19, 1911, continued in office thereafter, and such board was the only lawful one in existence on January 20, 1912. The term of office of but one member of the old board had expired at this time unless the entire board had been legislated out of office by reason of the change to the commission form of government. It was also alleged in the petition for the writ that ch. 448, Laws of 1909, and ch. 387, Laws of 1911, were violative of several provisions of our constitution and therefore void, and that the members of the so-called board were neither *de facto* nor *de jure* officers and their act in removing the relator was a nullity.

On the part of the defendants and appellants it is urged (1) that the old board of police and fire commissioners ceased to exist for all purposes when the reorganization was effected on April 19; (2) that it was the duty of the mayor to appoint four members of a new board by virtue of ch. 387, Laws of 1911, and of the council to select one of their number to constitute a fifth member of such board; (3) that in any event the persons who acted on the board when the relator was removed were *de facto* officers and their acts were therefore valid; (4) that the acts of the board were legalized by ch. 488, Laws of 1913; and (5) that the laws of 1909 and 1911 referred to are constitutional and valid.

The circuit court held (1) that the acts in question were constitutional; (2) that the old board continued in office after the reorganization; and (3) that, whether it did or not, the mayor had no authority to appoint new members of the board at the time when he did, and that the proceedings of the board in so far as they affected the relator were void.

In support of the judgment the respondent urges in this court that the board which removed the relator was an unlawful body; that the members of the board were not *de facto* officers; and that the statutes of 1909 and 1911 are void (a) because they attempt to delegate legislative power, (b) because the classification of cities attempted to be made is not a legitimate one, (c) because the acts prescribe unconstitutional qualifications for officers, and (d) because they arbitrarily exclude certain citizens from the privilege of holding office altogether.

1. Sec. 959—40, Stats. (Laws of 1909, ch. 181), provides for a board of police and fire commissioners in all cities of the second and third classes and for the manner in which the commissioners shall be appointed, and the succeeding sections define the rights, powers, and duties of such board. Its powers over the police and fire departments are broad.

Ch. 448, Laws of 1909, provided a radically different scheme for the government of our cities from that found in our general charter law or in our special charters. The new scheme comprehended the wiping out of most of the existing offices and of placing the full power to govern and run the affairs of a city in the hands of three men. They might employ such help as they needed, but the responsibility for the city government was placed on their shoulders. If their administration was successful the credit belonged to them, and if it was not there was no chance to shift the blame, because there was no divided responsibility. This legislative idea is quite apparent from the whole act and finds definite expression in sub. 1, sec. 925m—308, Stats. (Laws of 1909, ch. 448), which reads:

"A city so reorganized shall be governed by its council, consisting of the mayor and councilmen elected as hereinbefore provided, *and such council shall have all the powers and perform the duties had and exercised by the mayor and coun-*

*cil and the several administrative and executive officers,
boards, and commissions of such city,* whether its former
organization existed under general or special law."

By virtue of this provision all of the powers and duties for-
merly exercised by the board of police and fire commission-
ers of the city of Appleton were taken away and transferred
to the new council. There was no further duty or function
which the old board could perform. This being so, we
think it was clearly the intention of the legislature that it
should be wiped out. As a positive or even a negative force
in the government of the city it was neither useful nor orna-
mental, and we do not think it was contemplated that it
should be carried along as a useless appendage. The statute
cited was inconsistent with sec. 959—40, Stats. (Laws of
1909, ch. 181), and succeeding sections, and therefore the
existing board was not saved or continued in office by sub. 1
of sec. 925*m*—303, being part of ch. 448, Laws of 1909.
Assuming for the present that the law of 1909 was valid, we
think the old fire and police board ceased to exist on and
after April 19, 1911.

The 1911 legislature proceeded to engraft some of the old
system of city government on the new. It repealed sec.
925*m*—308 in its entirety, and enacted a new section in its
stead. By the amendment all the powers and duties con-
ferred on the mayor and common council of a city were, in
case of a change, conferred and imposed on the mayor and
councilmen of the new organization. However, it was pro-
vided by the new act that:

"All boards and commissions created and existing under
laws heretofore in force in any city shall continue to exist,
and all powers, authority, jurisdiction and duties conferred
and imposed upon such boards and commissions shall remain
unaffected by this act, except that the mayor shall not be
*ex officio* a member of any such board or commission."
[Sub. 5, sec. 925—308, ch. 387, Laws of 1911.]

The effect of this act in the instant case was to create a fire and police board in the city of Appleton, which board should have all the powers and perform all the duties conferred or imposed by the charter of the city prior to the adoption of the commission form of government. This amendment became effective two months after the reorganization and did not serve to reinstate in office those who had been legislated out by reason of the adoption of ch. 448, Laws of 1909.

By sec. 959—40, Stats., which became applicable to the city of Appleton by virtue of the 1911 amendment, the mayor was required to appoint annually between the last Monday in April and the first Monday in May one member of the board of fire and police commissioners for the term of five years or until his successor was appointed and qualified. It is insisted that the mayor had no lawful authority to appoint four members of the board when he did nor for the time for which they were appointed.

As to the member of the board who was to be selected by the mayor and council from their membership, the statutes, sub. 6 of sec. 925—308, required such cities as were already organized under the commission form of government to make the selection at the first regular meeting of the council held after the act was passed and published. It is evident from this that the legislature intended that the board of police and fire commissioners should be organized and proceed to carry out its functions promptly after the act of 1911 was passed.

The board was created by the law as to cities already having a commission government, but there were no officers to act until they were named. For all practical purposes, there were vacancies to be filled as soon as the act became effective. Sec. 959—40 provided that vacancies in such board should be filled by the mayor. As before stated, the section became part of the charter of the city when it was enacted. It was part of the charter before the commission form of govern-

ment was adopted, because it was one common to all cities, and pursuant to its provisions a board of fire and police commissioners had been appointed. By sec. 925m—303 it was provided that any law applicable to the city before its reorganization, and not inconsistent with said ch. 448, was continued in force.

The only default of the mayor was in not promptly naming the commissioners he was authorized to appoint after the passage of the act. The only default of the councilmen was in not naming one of their number more promptly to act on such commission. This temporary failure of duty in no way invalidated these acts when they were done. *State ex rel. Elliott v. Kelly,* 154 Wis. 482, 143 N. W. 153. There may be some doubt as to whether the terms specified in the appointments were legal, but it is wholly immaterial whether they were or not. The authority existed to make the appointments for as long a time as they were made, and clearly the appointees were *de facto* officers. It follows from what has been said that the commission who tried the relator were at least *de facto* officers and probably *de jure* officers as well, if the law providing for a commission government for cities is constitutional. There is nothing to show that the old board ever assumed to act or perform any functions after April 19, 1911.

If it should be admitted that the acts of 1909 and 1911 referred to were unconstitutional and void and that the members of the old board never were legally ousted from office, we do not see how the concession could help the respondent's case. It is conceded that the office was established by a perfectly valid statute, ch. 247, Laws of 1897 (sec. 959—40 *et seq.*). If ch. 448, Laws of 1909, was void, it did not operate to repeal said ch. 247 and there was no need of re-enacting that chapter in 1911. So it is clear that there was a *de jure* office. There is no claim that the old officers continued to act after April 19, 1911, or that they did not ac-

cept the situation and assume that their offices then became vacant. When the respondent demanded his hearing the appellants were in possession of the offices and assuming to act as officers and to perform the functions of the offices. The respondent submitted his case to them for decision. There would seem to be little doubt that the appellants were *de facto* officers under the authorities, and that as such they had the power of removal. *State ex rel. Elliott v. Kelly,* 154 Wis. 482, 143 N. W. 153; *State ex rel. Kleinsteuber v. Kotecki, ante,* p. 66, 144 N. W. 200; *State ex rel. Jones v. Oates,* 86 Wis. 634, 57 N. W. 296; *State v. Bloom,* 17 Wis. 521; *Chicago & N. W. R. Co. v. Langlade Co.* 56 Wis. 614, 627, 14 N. W. 844; *Strange v. Oconto L. Co.* 136 Wis. 516, 117 N. W. 1023.

2. We do not intend to cast any doubt upon the constitutionality of the acts of 1909 and 1911 by anything that has been said. The questions raised do not appear to be very serious.

The right of the electors to determine by vote whether a city should elect to come under the law no longer presents an open question in this state since the decision in *State ex rel. Van Alstine v. Frear,* 142 Wis. 320, 125 N. W. 961.

3. The provision by which a city at the end of six years may by vote of its electors abandon the commission form of government and go back to its old charter is more doubtful, but if this part of the act should be held invalid when the question is presented in a proper case, we do not think that the entire act would fall with it. It seems perfectly obvious that the legislature would have enacted the rest of the statute had it been aware that this particular part of it was invalid. It was an option law which cities might adopt or not as they saw fit. It was conceived with the idea that it afforded a more efficient method for city government than the system in vogue. The proviso has nothing to do with the new system of government. It may be that cities acting under the

belief that they could go back to their first love after the expiration of six years might be more willing to try the experiment than they would be if no such right existed, but we fail to see how this consideration could have affected the legislature. It has the right at any time to wipe out the new system if it proves to be a failure.

4. Neither do we think the law obnoxious to the constitution because it does not apply to cities of the first class. The classification of cities made by the general charter law has been sustained in numerous cases. So have acts which legislated for one or more of the classes so named. The classification having been made, it is held that the power of the legislature to legislate for one or more of the classes is quite plenary, although no reason can be advanced why the legislation should be confined to the class or classes covered. Ch. 575, Laws of 1911, furnishes a good example of such a law, and it was sustained by this court in *Wis. Cent. R. Co. v. Superior,* 152 Wis. 464, 469, 140 N. W. 79.

5. The most vigorous attack in the oral argument at the bar was made on the provision which requires a candidate for the nomination to office at the primary election to secure the signature of twenty-five resident electors to a statement that the signers know the prospective candidate "to be a man of good moral character." It was argued that a man may make a capable and even an excellent officer and still have an unsavory moral character. A number of individuals who were conspicuous in public life in the past were named by way of illustration, and some of them did not live in the remote past either. In this connection it was argued that a man of bad moral character has a constitutional right to run for office which the legislature cannot take away, and that courts have been too prone to ignore the right of the individual and to sustain acts of doubtful validity out of deference to the legislative branch of the government.

The provision of the constitution offended against is said

to be sec. 3 of art. XIII. This section prohibits certain classes therein named from holding office, and the argument is that all who are not included in these classes have the right to hold any office to which they can be elected, regardless of qualification. When we consider the ease with which petitions that do not call for the payment of money will attract signers, it is quite obvious that the requirement of the statute and the requirement of good moral character in fact are, from a practical point of view, essentially different things. However, treating them as being synonymous, we could hardly adopt respondent's construction of the constitutional provision in question. We apprehend that if the legislature should provide that no person should be elected president of the university or of a normal school in this state unless he knew the multiplication table, it might do so. As a matter of fact, qualifications are prescribed for many if not most of the persons who are to fill offices recently created, and of course they can be where the office is not a constitutional one in reference to which the constitution prescribes the qualifications. *State ex rel. Tesch v. Von Baumbach,* 12 Wis. 310; *Fordyce v. State ex rel. Kelleher,* 115 Wis. 608, 614, 92 N. W. 430; *State ex rel. Buell v. Frear,* 146 Wis. 291, 299, 131 N. W. 832. The officers here involved are not constitutional officers, and if the legislature had prescribed good moral character as a qualification, we think it would be acting within its rights.

6. The provision of the act excluding saloonkeepers from the office of mayor or councilman must be sustained on a different basis if it is sustained at all. The business of retailing liquor is licensed and is lawful and those who engage in it are not outlaws so long as they obey the laws. We think their exclusion can be justified on another ground, however. The mayor and councilmen determine who are fit and who are not fit persons to license. They make ordinances and regulations regulating the liquor traffic and are charged to a

certain extent with the enforcement of the state laws in reference thereto. No doubt the legislative thought was that if one or more retail liquor dealers were placed upon the governing body of the city, their private interests might conflict with their duty to the public, and this is a legitimate reason for the disqualification. Undoubtedly this was the motive which actuated the legislature in amending sec. 959—40 so as to exclude licensed saloonkeepers from the board of fire and police commissioners.

*By the Court.*—The judgment appealed from is reversed, and the cause is remanded with directions to enter judgment in accordance with the opinion.