GRUNERT, Respondent, vs. SPALDING and others, Appellants.

*September 12 — October 20, 1899.*

*Towns: Formation: Discretion of county board: Jurisdiction of taxing officers: Land grant for military road: Exemption from taxation: Co-contractors: "Assigns" of contract: Patents of land: Practical construction of statute: Estoppel: State officers: Judgments: Conclusiveness: Parties and privies.*

1. It will be assumed, at least in the absence of a clear showing to the contrary, that a county board, in the exercise of the discretion delegated to it in respect to the formation of towns, was controlled by proper motives and sufficient reasons.

2. A single tract of land, surrounded by an unbroken boundary line and capable of being traversed from one extremity to the other · without leaving its territory, may, in the discretion of the county board, be designated as a town, even though it has a length of 110 miles and at places is but two or three miles wide; and all the lands embraced within the limits of a town so designated will be within the taxing jurisdiction of its officers.

3. Ch. 429, P. & L. Laws of 1867, exempting from taxation lands granted by Congress to aid in the construction of a military road, limited such exemption to the "time that the title to such lands shall remain in the state or in the contractor to construct said road or his assigns." The contract could be assigned only with the consent of the commissioners and upon the giving of a bond by the assignees · for its full performance. After the acceptance of a bid for the work, but before the execution of the contract by the successful bidder, two persons agreed with him to pay him a certain sum per mile for so much of the road as the three might decide should be built, he agreeing to build that portion of the road and that they should receive three fourths of the land earned thereby. *Held,* that said persons were not co-contractors for the work nor assigns of the contractor, within the meaning of the act of 1867, so as to make their shares of the lands earned exempt while held by them.

4. The fact that a patent for a portion of the lands earned was issued by the governor to one of said persons "as partner and assignee of" the contractor does not conclusively show that he was such so as to entitle him to the exemption, as the result either of a practical construction of the contract or of an estoppel.

5. The state is not bound or estopped by a construction placed by a state officer upon a contract made under legislative authority,

Grunert vs. Spalding and others.

where he is not authorized to act for the state in that particular respect.

6. In a subsequent litigation between the same parties or their privies, though upon a different cause of action, the conclusiveness of a prior judgment as to an issue actually decided thereby cannot be avoided by a mere new argument which, though not then urged, was necessarily, in effect, overruled by the previous decision, nor by new or different evidence upon the same question.

7. In a subsequent litigation between the same parties or their privies on a different cause of action, a prior judgment is conclusive only as to those issues which affirmatively appear to have been in fact adjudicated.

8. The mere personal effect of a judgment is absolutely confined to the parties to the litigation, and does not attach to or become a rule of property as to any other thing than the particular subject of the controversy which was closed by the judgment.

9. It is only when the particular property or right which has been transferred is affirmatively shown to have been the subject matter of the former adjudication, and its status settled thereby, that the effect of that litigation is conclusive upon a grantee or transferee of property.

APPEAL from a judgment of the circuit court for Oconto county: S. D. HASTINGS, JR., Circuit Judge.  *Affirmed.*

By an act of Congress of March 3, 1863 (12 Stats. at Large, 797), there were granted to the states of Wisconsin and Michigan certain lands as aid for the construction of a military road from Ft. Wilkins, Copper Harbor, Keweenaw county, in the state of Michigan, to Ft. Howard, Green Bay, in the state of Wisconsin.  That grant was accepted by the state of Wisconsin, by ch. 478, Laws of 1864, by which act was created a commission authorized to survey and contract for the construction of such a road through Wisconsin, to be paid for only in the granted land.

On August 4, 1864, those commissioners entered into a contract with James M. Winslow, of St. Paul, for the construction of the road in Wisconsin, in consideration of three sections of land to a mile of road.  That contract did not exactly comply with the terms of the act of 1864.  It was

assigned by Winslow, with the consent of the commission-
ers, to the United States Military Road Company, a corpora-
tion, and by that corporation, on August 9, 1866, again with
the consent of the commissioners, was assigned to Jackson
Hadley; the commissioners extending the time for complet-
ing the construction to August 24, 1868. By Gen. Laws of
1865, ch. 331, the variation of the contract from the law of
1864 was authorized, and by P. & L. Laws of 1867, ch. 79,
the terms of the contract, and its assignment and extension
to Hadley, were ratified and confirmed. Hadley and his
assignors prior to March, 1867, had constructed, and the
commissioners accepted, thirty miles of said road, leaving
about 110 miles for construction.

Hadley died March 3, 1867, and, shortly after, the commis-
sioners formally determined that the work of constructing
said road was not diligently and properly prosecuted, and
that the representatives of said Hadley had forfeited all
rights which they might have by virtue of said contract,
and proceeded, in pursuance with the act of 1864, to adver-
tise anew for bids. One J. W. Babcock was the only bidder,
and he offered to build the remainder of the road, exclusive
of the thirty miles constructed by Hadley, at the same rate
of three sections per mile, payable as each ten-mile division of
the road was completed, which proposal was opened, ac-
cepted, and approved by the commissioners on May 30, 1867,
and a contract made in pursuance thereof on July 20, 1867,
providing, among other things, " that this contract, and every
part thereof, and any interest or interests therein, shall not
be assigned or assignable to any person or persons, firm or
corporation, in any manner or for any purpose whatsoever,
without the written consent of the said commissioners, or
their successors in office, first had and obtained, giving the
name of the assignee or assignees agreed upon; such assignee
or assignees to give bond to the state of Wisconsin accord-
ing to the aforesaid act of the legislature of Wisconsin."

Said contract also recited the forfeiture and cancellation of the Winslow-Hadley contract.

Shortly prior to the making of the Babcock contract of July 20, 1867, and after the acceptance of his bid, to wit, July 12, 1867, a written agreement was entered into between George N. Fletcher, J. W. Babcock, and A. G. Crowell, the material part of which is as follows: "This agreement, made this above date by and between George N. Fletcher, of the one part, J. W. Babcock, of the second part, and A. G. Crowell, of Lock Haven, Pennsylvania, of the third part, whereby the above-named parties agree to purchase of the heirs of Jackson Hadley their interest in the unfinished part of the United States Military Wagon Road, commencing at Green Bay, Wisconsin, and running north to the state line, being some one hundred and ten miles, for which the parties agree to pay five thousand dollars, as per agreement with Otis B. Hopkins, representative of the said heirs, and J. W. Babcock. The said Crowell agrees to pay one fourth part the said five thousand dollars, and also the one fourth part of the cost of building so much of the said road as the parties shall decide to build, and the said Fletcher is to pay three fourths of the said five thousand dollars and the building of said road; and the said Babcock agrees to spend his time in overseeing and doing the work in building said road, for which said Babcock is to receive for his share one fourth part of the whole amount of land received for said job; and the said Crowell is to receive one fourth part of the balance of said lands, after taking out said Babcock share, and the said Fletcher is to receive three fourths of the balance left. The said lands may be equally divided, each one receiving his share in acres, by making as many divisions as may be necessary and each one bidding for the same, or they may be held in common and sold and the proceeds divided as the parties hereafter shall decide. . . . And it is further agreed, if, upon examination, that it will

not be advisable to build more than thirty miles of said contract, or any other part of said contract, then the said Babcock is to be released from overseeing the same, but is to receive *pro rata* for the number of miles he may build in proportion to the whole as hereinafter agreed upon; and the said J. W. Babcock hereby binds himself to build the whole one hundred and ten miles, and to get the same accepted by the commissioners, for the sum of thirty thousand dollars, to be paid him by the said Fletcher and Crowell, as above stipulated."

In pursuance of this contract an assignment was procured from the administratrix of Hadley, dated July 19, 1867, of all of the Winslow-Hadley contract, except the thirty miles of road already completed and the lands due therefor. It also appears that on the 23d of July said administratrix also conveyed to Crowell all interest in the first thirty miles and the lands due therefor, subject to indebtedness to a subcontractor.

Babcock proceeded with the construction of the road under his contract with the commissioners of July 20, and by November 25, 1867, had completed forty miles of said road, which was certified to the Secretary of the Interior by the governor, and place lands approved to the state of Wisconsin therefor May 10, 1868, and indemnity lands on April 5, 1869. The indemnity lands so approved include the lands involved in the first and second causes of action here.

On April 1, 1868, Babcock assigned to one Charles M. Smith, of Chicago, an undivided one-fourth of all the lands earned by the construction of said forty miles of road, in pursuance of which, on February 23, 1870, a patent for said undivided one-fourth was issued to him by the governor of Wisconsin. His interest, however, is not further involved in controversy in this action, the taxes thereon having been duly paid.

On June 20, 1873, Babcock executed to A. G. Crowell an assignment of an undivided three-sixteenths of the same lands, requesting the governor of the state of Wisconsin to issue to said Crowell a patent therefor, and containing no intimation of any previous rights of Crowell therein. On July 7, 1873, said undivided three-sixteenths was patented by the state to Crowell, the patent reciting the act of Congress of April 4, 1864, the previous contract with Winslow (assigned to Hadley), the completion of thirty miles by him, the cancellation of that contract, the assignment of the unperformed part of that contract to Babcock, Crowell & Fletcher, the making of the new contract with Babcock, and the construction of the forty miles of road, and the assignment of June 20, 1873, of Babcock to Crowell.

On May 29, 1868, Babcock executed an assignment to George N. Fletcher of an undivided nine-sixteenths of the lands due for building the forty miles of road then already accepted, reciting the making of the contract of July 20th with the commissioners, and requesting the governor to deed said share to Fletcher. On March 4, 1871, a patent was made by the governor to Fletcher, containing substantially the same recitations as those mentioned in the Crowell patent, and also reciting that the assignment to Fletcher was made in pursuance of the contract between Babcock, Fletcher, and Crowell, of July 12, 1867, whereby Fletcher became and was a partner with said Babcock in building said road, and as such partner furnished a portion of the money to build said forty miles of road, and was to receive as his share nine-sixteenths of the land earned in building the same. This patent runs to Fletcher, as follows: " Do give and grant unto the said George N. Fletcher, partner and assignee of said John W. Babcock as aforesaid," etc.

Before the making of Babcock's bid, to wit, on April 9, 1867, by what is known as chapter 429 of the Private and Local Laws of that year, it was provided that all the lands

Grunert vs. Spalding and others.

located in the state of Wisconsin, granted by the act of
Congress of March 3, 1863, or which might thereafter be
granted by Congress, to aid in the construction of the mil-
itary road, " are hereby exempt from taxation and from as-
sessment of any kind, up to the 3d day of March, 1873, and
during the time that the title to such lands shall remain in
the state, or in the contractor to cônstruct said military
road, or his assigns: provided, that such lands, or any part
thereof, shall not be exempt from taxation from and after
the time the same shall be sold and conveyed by the con-
tractor or his assigns to purchasers for actual settlement, or
for the timber or minerals on the same, or for speculation;
and provided further, that such exemptions shall not extend
to any land which may now be or may hereafter be im-
proved and held by the contractor or his assigns; and pro-
vided further, this act shall be so construed that such ex-
emptions shall extend to any and all such lands as may be
pledged or conveyed as security for money raised to enable
the contractor or his assigns to pay for constructing said
military road, or any part thereof, so long as such lands so
pledged or conveyed as security shall be so held; and pro-
vided further, that nothing in this act contained shall be so
construed as to exempt any of such lands mentioned in this
act from taxation or assessment after the third day of March,
eighteen hundred and seventy-eight, for that purpose." The
foregoing act was amended by ch. 219, P. & L. Laws of 1868,
by substituting the figures "1869" in place of "1873" and
in place of "1878," where those years appear, so as to cut
down the exemption from taxation to March 3, 1869. This
last act was repealed in terms by ch. 178, P. & L. Laws of
1869, approved March 4th of that year,— the day after the
limitation had expired.

     During several years including and prior to 1875 this title
of Fletcher, while still remaining in him, was assessed for
taxation, and, the taxes not being paid thereon, the lands

were sold in May of the various years from 1872 to 1876 inclusive; and the tax certificates upon said sales were held, some by the county of Oconto, and some by one S. A. Coleman.   On March 30, 1877, Fletcher brought suit in the circuit court for Oconto county against the officers of the county of Oconto and S. A. Coleman.   The complaint alleged the act of Congress of March 3, 1863; its acceptance by the act of April 4, 1864, and the appointment of the commissioners; the passage of the taxation exemption act of April 9, 1867; publication of that act; the making of the so-called partnership agreement of July 12, 1867, between Fletcher, Babcock, and Crowell; the making of the contract by the commissioners with Babcock on July 20th; and alleged that said contract, although taken in the name of said Babcock individually, was in fact taken for the benefit of Babcock, Crowell, and Fletcher as partners; alleged the building of the forty miles of road in 1867, and the conveyance by the United States of the lands therefor; that the agreement by Babcock with the commissioners was made with full knowledge on the part of himself and of the commissioners, "and of the members of the firm of Babcock, Fletcher & Crowell, of the existence and of the tenor and effect of said act of the legislature exempting all the lands so granted by the United States to the state of Wisconsin from taxation and assessment of any kind during the time that the title to said lands should remain in the state, or in the contractor to construct said military road, or his assigns, and that the fact that said state so agreed to exempt said lands from taxation entered into the consideration for the construction of said road, and was a material part of such consideration and of the contract between said commissioners and said firm."

The complaint also alleged that all of the lands described (which include those here involved) were earned by the construction of said road by the plaintiff, Fletcher, and his co-contractors above named, and " are a portion of the lands

granted to the state of Wisconsin by the United States to aid in the construction of said road, and are lands which were and are by said act of the legislature exempted and agreed to be exempted from all taxes and assessments as therein provided, to wit, until March, 1873, and during the time that the title thereto should remain in the state or in the contractor to build said wagon road." And, further, "that the lands were so earned in 1867, and were afterwards conveyed to this plaintiff by said state of Wisconsin, by patent, in payment for his proportion of the work done upon said road, as one of the contractors for building the same, in and during the year 1867, and that the same are now still owned and held by this plaintiff, and the title thereto still remains in him, and that he hath never improved any portion thereof or done anything with or to them whatsoever." The complaint proceeded further to allege the location of the various lands, those here in dispute being for the year 1875 claimed by the town to be located in the town of Marinette; the allegation being that said town was not contiguous, and that the lands were separated from the town of Marinette. The complaint also alleged that none of said lands were valued by the assessors from actual view, as required by law, but that the valuation was made arbitrarily and without view, and that the tax sales of any portion of said lands were absolutely null and void, and further alleged the failure of the assessors to take and subscribe oaths as required by law. The complaint prayed injunction against the issue of deeds on account of any of said tax sales, and for general relief.

The defendant Coleman did not appear in said action, and no answer on behalf of the board of supervisors or the county clerk appears in the record. On October 21, 1878, the court made his findings of fact, and entered judgment for the plaintiff. The court found that all the allegations of the complaint were proven and were true as therein stated, and adjudged " that all the lands described in the patents issued

Grunert vs. Spalding and others.

by the state of Wisconsin to the above-named plaintiff . . .
are exempt from taxation of all and every kind to the date
of filing the complaint herein, to wit, up to March, 1877, and
that all tax sales thereof, or any part thereof, prior to that
date, are absolutely null and void, and that all the certifi-
cates issued upon any sale of any of said lands prior to that
date are hereby canceled and annulled; and the defendants,
the board of supervisors of the county of Oconto, and Rob-
ert Ellis, county clerk of the county of Oconto, and their,
and each of their, successors in office, agents, deputies, and
employees, are commanded and enjoined perpetually to re-
frain and desist from selling or disposing of any of the tax
certificates on any of said lands, or issuing any tax deed
upon any of the lands, in either of said patents described,
on account of any sale thereof for taxes of any year prior to
the year 1876, to wit, on any of the tax certificates in the
complaint in this action described. Said lands are described
as follows, to wit: 'An equal undivided nine-sixteenths of
the following described lands' [including the lands involved
in the first and second causes of action in the present case]."

The same lands were again assessed for taxation for the
year 1876 by the town of Marinette, and in May, 1877, the
interests of Fletcher and Crowell were sold for nonpayment,
and tax certificates issued to Oconto county. A tax deed in
due form was thereafter issued to one W. H. Webster, as
assignee of said county, on the 17th day of September, 1885,
and duly recorded on the 22d day of October, 1885; and in
May, 1886, said Webster quitclaimed to the above-mentioned
S. A. Coleman an undivided one-fourth of whatever interest
he acquired under the tax deed, which interest, together with
the right of action for the trespasses of the defendants, was
conveyed to the plaintiff before the commencement of this
suit.

The Fletcher nine-sixteenths interest was conveyed by
Fletcher November 5, 1879, to Bray and Choate, who before

the trespasses conveyed the same to the defendants. The Crowell three-sixteenths was conveyed some time after the year 1877, and came through mesne conveyances to Bray and Choate, who before the alleged trespasses conveyed the same to the defendants. The four-sixteenths interest which had been patented to Smith came through mesne conveyances to Bray and Choate September 25, 1876, and had been conveyed to the defendants before the alleged trespasses. The trespasses sued for in the first and second causes of action were committed about April 1, 1894, and April 1, 1895, and before conveyance of the lands to plaintiff. It was stipulated that the amount of damages recoverable by the plaintiff, by virtue of his one-quarter of twelve-sixteenths of the lands, was $10,000, if his title is valid.

Maps showing the arrangement of certain towns in Oconto county at various stages in the history of that county were put in evidence, by which it appeared that town 39, range 12 east, in which the lands in controversy are situated, in 1876 was in the town of Marinette, and that said town was bounded on the northeast side by the state line between Wisconsin and Michigan, which was marked by the Menomonee river, and was bounded on the south and west by an irregular line marked by a series of north and west jogs, but extending generally in a northwesterly direction, and, on the line between towns 23 and 24 in range 21 east, approaching to within two miles and a half of the state line; so that it appeared that the inhabited part of the town of Marinette, in the southeast point thereof, was connected by a very narrow strip with the great bulk of the territory of the town, lying to the north and west of the northeast corner of town 23, range 20, which defendants claim was a practical infringement of the contiguity of the territory of said town. It does appear, however, that the boundary of said town at that time was a continuous line, and no other town or territory intervened, or needed to be passed over in perambulating such boundaries.

Grunert vs. Spalding and others.

In 1894 and 1895 the defendants held patent title to certain other lands in said town 39, range 12 east, and cut timber thereon. Said lands were assessed for taxation by the town of Marinette for the year 1876, and were sold in May, 1877, a tax certificate issued to Oconto county, and a tax deed issued May 10, 1880, to J. M. Simpson, as assignee of said county, and duly recorded May 21, 1880, which lands were quitclaimed by said Simpson to one William Urquhart June 11, 1886, and on May 23, 1896, were transferred by said Urquhart to the plaintiff, together with his rights of action for any trespasses thereon, which trespasses constitute the third and fourth causes of action. It was stipulated that the damages to which plaintiff is entitled for timber cut in 1894 and 1895 on these lands are $2,500, if his title be valid; the only ground of attack on his title being an alleged invalidity of the tax proceedings by the town of Marinette, by reason of its shape and the asserted noncontiguity of these lands to the inhabited part of the town.

It appeared by the findings that the greater part of the lands situated in township 32, ranges 20 and 21, where the town of Marinette is narrowest, were owned by the Peshtigo Company, which had its sawmills on, and also at the mouth of, the Peshtigo river, and that timber from said lands was floated down the said river; also, that a road extended from the village of Marinette, up along and near the west bank of the Menomonee river, to the vicinity of section 24, in township 32, range 22, and that a road also extended from Peshtigo up the Peshtigo river to said lands situated in town 33, ranges 20 and 21, and no road connected the territory in the town of Marinette, along the Menomonee river, with the Peshtigo road, or the territory lying along the same, and that the interests of such localities were separate and distinct; also, that the lands in the town of Marinette, up to 1867, north of the line between townships 23 and 24, were valuable chiefly for pine timber, which was chiefly tributary to the Menomonee river, down which it was floated to mills

at Marinette. The circuit court held the plaintiff's title to both parcels of land valid, and rendered judgment for $12,500, from which the defendants bring this appeal.

The appellants contend that plaintiff's title, founded on tax deeds for taxes of 1876, is invalid: First, because the claimed noncontiguity of the town of Marinette deprived its officers of power to assess or levy taxes on any of the lands; second, that the lands involved in the first and second causes of action were exempt from taxation in 1876, in the hands of Fletcher and Crowell, by virtue of ch. 429, Laws of 1867; and, third, if neither of the former contentions is sustained, that the interest of Fletcher in said lands has been adjudged exempt, and that such adjudication is conclusive in this action, as against the plaintiff as a privy with Fletcher.

For the appellants there were separate briefs by *E. C. Eastman* and *Hooper & Hooper*, and oral argument by *Mr. Eastman* and *Mr. Moses Hooper*.

*H. O. Fairchild*, of counsel, for the respondent.

The following opinion was filed March 14, 1899:

DODGE, J. 1. The first question which naturally arises, and the only one which affects all of the causes of action, is whether or not the lands in the year 1876 were within the taxing jurisdiction of the officers of the town of Marinette. It is vigorously contended by the appellants that because this town has been laid out and extended northwesterly from township 30, range 23 east, to township 42, range 11 east, thus having a length of about 110 miles, and there being places in the course of such extension where said town was only two or three miles wide, it falls within the rule laid down in *Chicago & N. W. R. Co. v. Oconto*, 50 Wis. 189. In that case the authority of the taxing officers of the town in question was assailed for the reason that the lands assessed were entirely outside the inclosing boundary of the territory wherein the taxing officers resided; that is to say, two dis-

Grunert vs. Spalding and others.

tinct and separate parcels of territory were attempted by
the ordinance to be called one town.   Each portion was sep-
arate and distinct from the other, surrounded by its own
boundaries, and access from one to the other was necessarily
intercepted by some part of another town or towns.   In that
case, after an exhaustive study of the history of such civil
divisions, and of the derivation and terminology of the word
town, it was held that such an arrangement as there pre-
sented was not within the constitutional permission given to
boards of county supervisors.  · The ultimate decision, being
that a town must consist of contiguous territory, was predi-
cated upon the proposition that the significance of the word
was a single inclosed space, and could not be satisfied by
two distinct entities; the further consideration evidently
having weight with the court, that such an arrangement as
there presented was restrictive of the sovereign power of the
legislature to organize assembly districts consisting of con-
tiguous territory and bounded by county, precinct, town, or
ward lines.

The reasons involved and necessarily considered in deter-
mining the shape and boundaries of the civil subdivisions of
the state are essentially legislative in their character.   Those
reasons are too numerous and various for expression.   Espe-
cially are they complicated within the forest portions of the
state.   Distances there cease to be measured by miles, but
by possibility of intercourse.   Relationships of interest and
convenience are affected largely by the courses of the rivers
and their tributaries.   Large areas exist, or did exist, utterly
devoid of inhabitants, which it is obvious cannot properly
be laid off into towns by themselves; for the town contem-
plated by the constitution is a civil entity, exercising some
functions of government,— conditions which cannot be met
in the absence of inhabitants to exercise that government.

In the present case it appears that the town of Marinette
was laid off generally as tributary to the Menomonee river,

and that the southerly or southwesterly line of that town
approximately followed the divide between the tributaries;
of the Menomonee and the tributaries of the Peshtigo.   The·
value. of the remote portions of the town consisted in the
growing timber, which, as appears. by the findings, was
largely the property of people having a location, if not a
domicile, near the mouth of the Menomonee, and in the ex--
treme southeastern part of the town.   At the moment of·
assessment, on the 1st of May, much of such property is in
a transitional state, having been severed from the land, and
being on its way along the streams from· where it grew to·
the sawmills where it is to be converted.   Serious, though
perhaps not insuperable, entanglements may well arise in.
the exercise of the various functions of town government
over such property, if, at different stages of its progress,
from the tree to the mill boom, it is, in different jurisdic--
tions.   The expenditure of town taxes for·roads.was largely
controlled by the consideration of affording access from:
these settled portions to the remote lands owned there, and
these roads made territory connected by them more con-·
tiguous and accessible than other· regions much nearer in,
miles.   These considerations, and many. others which might.
be mentioned, serve only to· emphasize the proposition be-;
fore announced, that the legislature, and those bodies exer--
cising legislative powers, are properly and necessarily in--
vested with the discretion and judgment how to harmonize
such conflicts.   The judicial branch of the government has.
no equipment for such service, and whatever abuses may
arise under the system of control by·legislature and its dele--
gates, promptly responsible to popular criticism, they would
certainly be greatly increased, though perhaps varied in.
kind, were the courts to attempt to· assume this function.
*Washburn v. Oshkosh*, 60 Wis. 453, 457.   We cannot pre--
sume any motives but right ones· as controlling county offi-
cers in the exercise of the discretion delegated to them. by·

the constitution in the formation of these towns. Counsel strenuously argue that the purpose was to reach for taxation remote property, to lighten the burdens of those resident in the southeastern part of the town; but it was clearly right that these valuable timber lands should pay their share of the tax burdens of the state, and it is by no means certain that the least equitable arrangement is that those taxes should go to the treasury of the community who owned the lands, where were made the contracts with reference to them, and where the government would be called into action to render the aid and protection which are the ultimate justification of all taxes. *Wagoner v. Evans*, 170 U. S. 588. Suffice it to say, however, that it is not for the court to find reasons to justify the acts of officers in other branches of the government, but to assume, at least in the absence of clear showing to the contrary, the righteousness of their motives and the sufficiency of their reasons. We do not think it within the province of the court to say that this single tract of land, surrounded as it is by an unbroken boundary line, capable of being traversed from one extremity to the other without leaving its territory, is necessarily beyond the discretionary power of the county board to designate as a town; and, as a result, we hold that the objection to the jurisdiction of the taxing officers of the town of Marinette is not well taken. *Chicago & N. W. R. Co. v. Langlade Co.* 56 Wis. 614; *Schriber v. Langlade,* 66 Wis. 616; *Land, L. & L. Co. v. Brown,* 73 Wis. 303.

This conclusion disposes, adversely to the appellants, of the only question presented with reference to the third and fourth causes of action, and sustains the judgment rendered for the trespasses therein sued for, in the sum of $2,500. It also necessitates consideration of other questions relating to the first and second causes of action.

2. Were the interests of Crowell and Fletcher in these lands exempt from taxation in 1876, by virtue of ch. 429,

Laws of 1867? The considerations urged under this head are numerous, but the view we take of one of them makes discussion of the others unnecessary in disposing of this case. The exemption accorded by that act is limited to the " time that the title to such lands shall remain in the state or in the contractor or his assigns." The context shows clearly that the assigns referred to are assigns of the contract.

Were Fletcher and Crowell assignees of the contract with Babcock of July 20, 1867? It should be noted that there can be no contention that the lands in question were earned under the Winslow-Hadley contract, so the assignment of that contract to Fletcher and Crowell is not a material circumstance. It is expressly found in the stipulated finding of facts that the work of constructing the road was done under the Babcock contract of July 20th, and it is also found that the Winslow-Hadley contract had been declared forfeited by the commissioners.

The question is, therefore, as to the effect of the agreement of July 12th between Babcock, Crowell, and Fletcher. Babcock was the contractor, and by the terms of his contract he could assign only upon condition that the commissioners should consent in writing and that the assignees should give bond to the state of Wisconsin according to the terms of ch. 429, which required a bond conditioned on the full performance of the contract.

The agreement between Babcock, Crowell, and Fletcher does not, in terms, assign this contract, which, indeed, was not executed until a week later. It is, however, strenuously urged that the agreement constitutes a copartnership for the purposes of carrying out the contract with the commissioners, so as to make them co-contractors with him, or equitable assignees thereof. When reduced to its ultimate terms, that contract is simply that Crowell and Fletcher will pay to Babcock a proportionate part of $30,000 (about $273 per per mile) for so much of the road as the three decide shall

be built, in consideration whereof Babcock agrees to build that portion of the road and that Crowell and Fletcher shall receive three quarters of the lands earned thereby. There is scarcely any element of partnership here. Crowell and Fletcher did not risk their investment upon the contingencies of the success of the work. No agency was created whereby, either as between themselves or to third persons, they became responsible for any engagements made by Babcock. If he was solvent,— a fact as to which there is no information,— it would have been an absolutely safe investment, by which they were assured three quarters of a specific quantity of land at a definite price, and, if they failed to obtain it by his failure to build the road, could have held Babcock in damages for breach of his contract. Further, the amount of their payment was not to vary according to the cost of the road. Babcock received the whole amount whatever the road cost, and received the same rate per mile whether the portion in fact constructed was more or less expensive than the average. Whether he made profit or loss in the enterprise, they were not to share in it. It is, as between the three, apparently a purchase of a specific interest in an ascertained quantity of lands at a fixed price, payable in advance, and not a partnership.

Whether or not these three were partners as between themselves is, however, quite inconclusive upon the question whether they were assignees of the contract within the tax exemption statute of 1867, when considered from the point of view of the state, which, of course, must control in construing that act. The object to be accomplished by these various legislative enactments and the contract under them was to obtain a road, according to the specifications, between certain termini. The contractor bound himself to build the whole road; so that, if for portions of it the lands assignable were more valuable than for other portions, or if some parts were more expensive than others to build, it made no dif-

Grunert vs. Spalding and others.

ference. The entire quantity of lands was, under the contract with the commissioners, the consideration for the building of the entire road. It might well be that upon examination it would appear that the first thirty or forty miles of the road would earn by far the most valuable lands, or would cost much less to construct, leaving the remainder a less profitable undertaking; but this was guarded against by securing an entire contract, which was, of course, the vital and material thing to the state. If the tax exemption statute of 1867 was contractual at all, the assumption of this obligation to complete the road constituted an essential part of the consideration therefor. It was to protect that purpose that the contract provided that no one should be recognized as an assignee unless he obligated himself to the entire contract by giving bond for its performance. This is what Fletcher and Crowell distinctly refrained from doing in their transaction with Babcock. It was between them definitely specified that they should contribute toward only so much of the road as the three might decide to build. Under that contract they were at liberty to stop at the end of thirty, forty, or any other number of miles, take their three fourths of the land thereby earned, and leave the road uncompleted; thus evading the very purpose of the legislation and of the commissioners' contract with Babcock, with no possibility of redress against them. It is a fundamental rule that statutes granting exemptions or privileges shall be strictly construed against the grant. *Weston v. Shawano Co.* 44 Wis. 242, 256. It would, therefore, be our duty, if the question whether Fletcher and Crowell came within the terms of the act were doubtful, to adopt a construction which would exclude them. It is, however, unnecessary to apply that rule, as it is clear they were not assigns of the contract, either technically or in spirit.

Defendants' counsel contend, however, that whatever might be thought, as an original question, of the construction of

this contract between Babcock, Fletcher, and Crowell, the acts of the governor, as evidenced by the patents, are conclusive — first, as a practical construction, and, secondly, as an estoppel. The recitations in those patents are, at best, ambiguous. The strongest expression in either of them is in the patent to Fletcher, which describes him as a partner. It is not, however, important to analyze these recitations, or to ascertain whether, if authorized, they have the effect contended for. It is the state of Wisconsin which must have given its assent to such a construction in order that it should have force either as evidence or by way of estoppel. The state of Wisconsin is a different thing from either the governor or the government of the state of Wisconsin. The act of the governor is the act of the state only when he is empowered by law to act for the state in that particular respect. His act, when not so authorized, is no more the act of the state than if done by a private individual. In *Poindexter v. Greenhow*, 114 U. S. 290, the court, in discussing the force of an act of legislature not authorized by the constitution, says: "In the discussion of such questions the distinction between the government of a state and the state itself is important, and should be observed. In common speech and common apprehension they are usually regarded as identical; and as, ordinarily, the acts of the government are the acts of the state, because within the limits of its delegation of power, the government of the state is generally confounded with the state itself, and often the former is meant when the latter is mentioned. The state itself is an ideal person, intangible, invisible, immutable. The government is an agent, and, within the sphere of the agency, a perfect representative; but, outside of that, it is a lawless usurpation."

Nowhere do we find any authority for the governor to make an agreement, or to modify one, with reference to these lands or the taxation thereof. The act of Congress

vested their disposal in the legislature of Wisconsin. The legislature vested the power to make contracts in a commission, and not in the governor. The legislature itself exercised, and did not delegate to the governor, the power to exempt from taxation, and fixed the limits of such exemption. If this contract, specifying how assignment might be made, were not within the power of the governor to make, he, of course, had no authority to modify it, either directly or by declaring a construction. Nor could he, directly or by construction, modify the act of the legislature. The rights of the public or of the state are not to be affected or surrendered by any officer unless the authority to do so is conferred.

The result of these views is, of course, that the lands in question were not, after their conveyance to either Crowell or Fletcher, exempted from taxation by ch. 429, Laws of 1867; which disposes of the controversy as to the three-sixteenths share formerly owned by Crowell.

3. As to the nine-sixteenths interest derived by defendants from Fletcher, appellants claim that by virtue of the judgment in *Fletcher v. Coleman et al.*, in Oconto circuit court, the exemption from taxation of such interest while held by him under said act of 1867 is *res adjudicata* as against Coleman and as against the plaintiff, his grantee of the lands and assignee of the cause of action in suit here for trespasses committed while Coleman claimed to be owner. The rules governing the efficacy of judgments in subsequent litigation between parties and privies are well established, and may be formulated thus: In a second litigation between the same parties or privies upon the same cause of action, the judgment is absolutely final as to their rights in that cause of action as to all things, not only those which were in fact litigated and decided by the court, but also those which might have been so litigated and decided. On the other hand, in a subsequent litigation between the same

parties or their privies upon a different cause of action, the judgment is only conclusive as to those issues which were in fact adjudicated. *Van Valkenburgh v. Milwaukee,* 43 Wis. 580; *Wentworth v. Racine Co.* 99 Wis. 26; *Cromwell v. Sac Co.* 94 U. S. 356; *Last Chance M. Co. v. Tyler M. Co.* 157 U. S. 683; *Southern P. R. Co. v. U. S.* 168 U. S. 1. To ascertain what those issues were, we may examine the proceedings, or extrinsic evidence may be considered. (Finding) *Last Chance M. Co. v. Tyler M. Co., supra;* (referee's finding) *Lumber Co. v. Buchtel,* 101 U. S. 638; (opinion) *Legrande v. Rixey's Adm'r,* 83 Va. 862, 867; (evidence) *Washington G. L. Co. v. District of Columbia,* 161 U. S. 316, 329.

The efficacy of the judgment is the same whether it be pleaded in bar or merely be offered in evidence, if it is material to the issues formed by the pleadings. If pleaded as an estoppel, it is effective as such. If offered as evidence, it is conclusive evidence of all matters so adjudicated and decided. Mr. Greenleaf (1 Ev. § 531) well says that, "where a former recovery is given in evidence, it is equally conclusive as if pleaded;" and this view is sustained by the great weight of the authorities, many of which are collected in the opinion in *Southern P. R. Co. v. U. S.* 168 U. S. 55–60. Indeed, in a litigation upon a different cause of action the prior judgment does not serve as an estoppel, but only as evidence; and when so offered it is conclusive evidence of the matters settled by it between the same parties. And, if such matters go in denial of the existence of any cause of action, they are admissible in evidence under the general denial. *Lombard v. McMillan,* 95 Wis. 627; *Carroll v. Fethers,* 102 Wis. 436. In the present case we have no extrinsic evidence as to the issues actually decided in *Fletcher v. Coleman,* but merely the complaint, the finding, and the judgment. The complaint asserts one ground of *exemption* from taxation, strictly so called, namely, that by virtue of ch. 429, P. & L. Laws of 1867, the lands in question were

exempt from taxation in the hands of Fletcher as a con-
tractor, or at least as an assignee of the contract, within the
meaning of that act. It also asserts the *invalidity* of the
tax certificates on the ground that the land was not within
the power of assessment or levy by the officers of the town
of Marinette; also for failure of assessors to view the lands,
and failure of certain taxing officers to take statutory oaths.
The finding is that all of the allegations of the complaint
are true as alleged. While the case apparently was in de-
fault, it is also apparent from the finding that evidence was
offered and considered by the court. Of course, upon such
complaint and finding a mere judgment canceling the cer-
tificates would be inconclusive. It might rest upon any of
the grounds above mentioned, and therefore would not *nec-
essarily* rest upon any one of them. But the judgment de-
cides, not alone that the certificates were void, but decrees
"that all the land described in the patents issued by the
state of Wisconsin to the above-named plaintiff [Fletcher]
was exempt from taxation of all and every kind to the date
of filing the complaint herein, viz. up to March, 1877." So
far as the judgment extends beyond the date of the levy of
the tax for the year 1875, it probably exceeds the relief
prayed by the complaint, and therefore is ineffective; but
it seems to be plain beyond dispute that the first point of
defense to the taxes, raised by Fletcher's complaint in that
action, was considered and adjudicated by the court. While
matters are not to be presumed to have been adjudicated on
mere conjecture or possibility, unless the fact clearly ap-
pears, yet writings in judicial proceedings must have rea-
sonable construction, and their language be taken as signifi-
cant. *New Orleans v. Citizens' Bank,* 167 U. S. 371, 390.

The plaintiff, however, urges that, even if this construc-
tion be placed upon the judgment, and it be held that by
virtue of ch. 429, Laws of 1867, the lands were exempt from
taxes in 1875 in the hands of Fletcher, other considera-

tions are now presented, which justify a different conclusion, which do not affirmatively appear to have been presented to or considered by the court in *Fletcher v. Coleman*. Those are stated to be: First. The amending act (ch. 219, P. & L. Laws of 1868), which, if effective, terminated the exemption on March 3, 1869, and which not being pleaded, the same may not have been before the court. Second. The facts with reference to the Hadley interest under a prior contract, and that the construction of ch. 429 was affected by the fact that certain acts in Hadley's behalf accompanied it through the legislature, indicating that all of the acts were introduced and carried-through in the interests of Jackson Hadley as assignee of the Winslow road contract. Third. That it is not certain that the terms of the Babcock contract, containing the prohibition against assignment, were presented to or considered by the court in that case. Fourth. That it does not appear that the court had presented to it the fact, now found, that Fletcher acquired his interest in the lands for the timber thereon and for speculative purposes; nor that an undivided quarter of all the lands earned under the Babcock contract had been conveyed to Smith long prior to the levy of the taxes adjudged void.

No doubt the conclusiveness of a judgment is limited in subsequent litigation on a different cause of action to the issue actually decided, and a new or independent issue raised in second litigation is not concluded; but that does not mean that such conclusiveness is destroyed by the fact that a new and cogent argument is presented, which does not appear to have been urged or considered on the first hearing. If that were so, the employment of new counsel would almost invariably nullify the effect of *res adjudicata*. Nor can such conclusiveness be avoided by the presence of new or different evidence upon the same question. Thus, in *Van Valkenburgh v. Milwaukee*, 43 Wis. 580, the plaintiff's title to land was admitted in the first suit, and adjudged upon

such admission.  In the second defendant offered evidence to deny that title, which this court held could not be received to defeat the conclusiveness of the former judgment, although it had not been considered in reaching that decision, the issue, viz. plaintiff's ownership, being the same in both actions.  As said in *Last Chance M. Co. v. Tyler M. Co.* 157 U. S. 683: " The question always is, Has there been such determination? and not upon what evidence or by what means it has been reached." The most extreme case which has been brought to our notice is that of *Boyd v. Alabama*, 94 U. S. 645, wherein an act of legislature, having once been sustained as a legal justification in a prosecution against defendant, was permitted in a second prosecution to be assailed as unconstitutional; it appearing that no such argument had been advanced in first case to defeat it.  That case was one which appealed most strongly to one's regard for morality and public welfare.  It has seldom been cited since, amid all the multitude of cases in the same court where the doctrine of *res adjudicata* has been considered and applied, and in which *Cromwell v. Sac Co.*, reported in the same volume, with opinion by the same justice, has been relied on.  The reasons given, namely, that courts do not usually consider doubts of the power of the legislature unless pressed on their notice, and that numerous instances have occurred where an act has ultimately been declared unconstitutional, although the same court had repeatedly enforced it as valid, are very cogent considerations against applying the rule of *stare decisis*, but not for denying conclusiveness to a judgment between the same parties which could have been rendered only by holding or assuming the act to be valid.   We are not inclined to so limit the conclusiveness of the thing adjudged as to permit its defeat by the presentation of a mere new argument necessarily, in effect, overruled by the previous decision, although not in fact urged thereon.  The issue disposed of in *Fletcher v. Cole-*

*man* was whether the lands in question were exempt from taxation, as late as 1875, in the hands of Fletcher. That issue involved, necessarily, the validity and continued force of ch. 429, P. & L. Laws of 1867, the construction of that act, the force and effect of the transactions and conveyances whereby Fletcher acquired his title, and the character of that title. All of the considerations urged by the respondent as novel in this case, which are material at all, are so only as argument or as evidence bearing upon the issue so previously determined. The only new issue presented is whether any material change of conditions occurred between the time of assessment and levy for 1875 and those of 1876, the negative of which is fully established. We see no escape from the conclusion, therefore, that the absolute exemption from taxation in 1876 of these lands is *res adjudicata* between Fletcher and Coleman and those in privity with them. *New Orleans v. Citizens' Bank*, 167 U. S. 371, 395.

The next question is whether the plaintiff is in privity with any of the parties to the action of *Fletcher v. Coleman et al.* as to the rights of property presented in this action. It should be remembered that this action is to recover damages for a trespass committed upon certain lands while the same were claimed to be owned by Coleman, who was a party defendant to that action. The general rule governing privity is reiterated in nearly all of the authorities as " mutual or successive relationship to the same rights of property." Those " who claim under or in the right of a party" are privies. The respondent urges as the essentials of privity, first, successive relationship to the same rights of property, and that a relation of privity is a relation of dependence, not independence or superiority; and applies these tests to a discussion of the fact that the plaintiff is not claiming under the same tax certificates as were adjudged void in the former action. This argument is a confusion of ideas. Strictly speaking, the right of property

claimed by the plaintiff in this action is the right of recovery accruing to Coleman by reason of the trespasses alleged. It is not even so far back as the right of property which Coleman at that time had in the lands themselves, but as to either of these rights of property there is obviously succession from Coleman to the plaintiff, and the relation of the plaintiff thereto is that of dependence upon the right which Coleman had. He has no other right whatever save that which Coleman has conveyed to him.

The following are some illustrative cases of privity, one or two of them taken from respondent's brief: *Finney v. Boyd*, 26 Wis. 366; *Warner v. Trow*, 36 Wis. 195; *Lawrence v. Milwaukee*, 45 Wis. 306; *Masten v. Olcott*, 101 N. Y. 152; *Lipscomb v. Postell*, 38 Miss. 476; *Porter v. Bagby*, 50 Kan. 412; *Lea v. Deakin*, 11 Biss. 23. The true question is whether, by virtue of the judgment above mentioned, facts establishing invalidity of Coleman's title as against the defendants were *res adjudicata* at the time of the alleged trespass, so that, if he had brought suit therefor, that judgment would have been admissible against him; and, if so, whether plaintiff is so in privity with him as to the right of action for that trespass that he is affected by the same facts, and, if so, bound by the adjudication thereof. The statement of the question seems to answer it. True, the source of Coleman's title was not the identical certificates adjudged void in *Fletcher v. Coleman*. If it were, we should be trying practically the same cause of action as in that former case. But as between him and Fletcher, or Fletcher's privies, the same facts and rules of law which rendered void the certificates involved in the former suit rendered invalid his title at the time of the trespass in 1894 and 1895. Had he brought suit for the trespass, he would at once have been met with an adjudication, in a suit to which he was a party, that the lands which he claimed to own were exempt from taxation, just as much in 1876 as in 1875 and earlier years;

from which must have resulted a judgment that he had no right of action against the parties committing the trespass. The plaintiff stands here claiming to maintain this suit, not by virtue of his subsequent acquisition of the lands, whatever his title thereto may be, but because Coleman has assigned to him his right of action for the trespass, which he might just as well have done without transferring the lands to him at all. It is difficult to imagine a more complete instance of identity and succession of rights than that arising from the mere transfer of a cause of action in tort. The assignee thereof must stand exactly in the shoes of his assignor, and no enlargement of the rights of the latter can be successfully claimed by the assignee.

To test the mutuality of this estoppel, suppose that the judgment in *Fletcher v. Coleman* had gone the other way, and these lands had been adjudged to be subject to assessment, and, the certificates involved in that suit having been redeemed, Coleman had thereupon obtained title, as now, upon the certificates for the tax of 1876, can there be any doubt that the judgment would have been *res adjudicata* in favor of Coleman or of this plaintiff, had the same grantees of Fletcher committed this trespass, and plaintiff had sued thereon, and been met with the former claim of exemption from taxation in 1876? If such an adjudication could have been invoked by the plaintiff in such case as against these defendants, the adjudication, having gone the other way, is equally available to the defendants against the plaintiff.

The argument of counsel that privity is predicated upon rights of property, and not upon persons, is a partial statement of the rule as applied to the case presented here. The conclusive effect of a judgment is against the parties thereto personally whenever the matter adjudicated again becomes material between them, and that personal effect attaches itself to any property or rights of such individuals when brought into litigation, and follows such property or rights

into the hands of a grantee or transferee thereof. It is not essential to the conclusiveness of the issues decided in *Fletcher v. Coleman* that we should find united the person Coleman and the particular tax certificates there adjudicated upon. *New Orleans v. Citizens' Bank*, 167 U. S. 371, 395; *Southern P. R. Co. v. U. S.* 168 U. S. 54. It is sufficient that we find Coleman claiming any rights which are dependent upon facts or law so adjudicated. And that condition of things did exist at the time the alleged trespasses were committed, and such conclusiveness is transmitted from him to his successor, or dependent, or grantee, the plaintiff, claiming the same right of action by virtue of Coleman's transfer. *Porter v. Bagby*, 50 Kan. 412.

To summarize our conclusions, therefore, we hold: First. That the town of Marinette, in 1876, was not illegal for want of contiguity; that the lands in question were within the taxing jurisdiction of its town officers; and that the assessments on none of the lands were void for that reason. Second. That Crowell was not a contractor, nor assignee of the contractor, within the meaning of ch. 429, Laws of 1867; and that the share of the lands owned by him was not exempt from taxation in 1876. Third. That by the judgment in the suit of *Fletcher v. Coleman* the exemption of the portion of the lands owned by Fletcher from taxation in 1876 is *res adjudicata* as against this plaintiff and in favor of these defendants in this action. And, as a general conclusion, that plaintiff is entitled to recover for the trespasses upon the lands involved in the third and fourth causes of action and for one fourth (Crowell's share) of the damages for the trespass upon the lands described in the first and second causes of action, but is not entitled to recover the remaining three fourths (Fletcher's interest) of the stipulated damages for the trespass on said last-mentioned lands. The plaintiff should have recovered, therefore, $5,000 damages, while $7,500 of the damages which he did recover were improper. The

judgment of the circuit court should be reduced from $12,500 to $5,000. Appellants should recover costs in this action.

*By the Court.*— The judgment of the circuit court is modified by reducing the recovery of damages therein to $5,000, and, as so modified, is affirmed.

CASSODAY, C. J., took no part.

Both parties moved for a rehearing.

For the appellants there was a brief by *Hooper & Hooper*.

For the respondent there was a brief by *Greene, Vroman & Fairchild*.

The motion was granted June 2, 1899, and the cause was reargued September 11, 12, 1899.

For the appellants there were briefs by *Hooper & Hooper*, and oral argument by *Moses Hooper* and *E. C. Eastman*.

*H. O. Fairchild*, of counsel, for the respondent.

The following opinion was filed October 20, 1899:

WINSLOW, J. Motions for rehearing were made in the present case by both parties, and upon consideration a rehearing was ordered upon the single question of the effect of the judgment in the case of *Fletcher v. Coleman*. It was, in effect, assumed in the former opinion that it appeared in the case of *Fletcher v. Coleman* that Coleman held or claimed to hold tax certificates upon the lands included in the first and second causes of action in this case, and hence that it appeared affirmatively from the record that the judgment in that case necessarily decided, as between Fletcher and Coleman, that Coleman's certificates thereon were void, because the lands were exempt from taxation in the year 1875. In justice to ourselves, it ought to be said that this assumption was entirely justified by the original briefs furnished us and the oral arguments made upon the first hearing. Upon the respondent's motion for rehearing, however, it

was urged (as the fact is) that two classes of lands were involved in the prior action, which were described in two exhibits attached to the complaint: Exhibit A covering lands earned in 1867, upon which Fletcher already held patents (which include the lands now under consideration); and Exhibit B covering lands which had not yet been patented, but which were alleged to have been earned in 1868, and of which the state was alleged to hold title in trust for Fletcher, and which are not involved in the present litigation. In connection with this fact, our attention was called to the further fact that the complaint in the prior action did not specifically charge that Coleman possessed any certificates upon the lands now involved, or upon *any* definite parcels of land, but simply charged that there had been tax sales of all the lands of both classes, and certificates issued thereon, " which certificates now belong to said county, or to some of the defendants, and some of which certificates belong to each of the defendants in this action; but which of such certificates belong to said county and which to the other defendants this plaintiff cannot state." No evidence having been preserved in the record of that case, and the finding being simply a general one to the effect that all the allegations of the complaint were true, and that the lands described in two certain patents executed by the state to Fletcher were exempt from taxation, the argument of the respondent was that it does not appear that the question whether the lands described in the first and second causes of action in the present action were exempt was ever in fact litigated or decided as between Fletcher and Coleman. It was admitted by respondent that the lands in question here were included in the first patent named in that judgment, and were the lands described in Exhibit A in that case; but, it appearing by the findings that the second patent was issued after the commencement of that action, and covered lands patented in lieu of the lands alleged to have been

earned in 1868, and described in Exhibit B, the argument was also made that, the patents not being before the court, the judgment did not in fact adjudicate as to the lands described in Exhibit B at all, and that the certificates held by Coleman might well have covered only lands named in Exhibit B, as to which lands there never had been any judgment of exemption.   The considerations thus urged seemed so important, and their bearing upon the case so obvious, that it was deemed best to order a reargument of the question as to the conclusiveness of the prior judgment, in order that the questions now suggested might receive full argument and consideration.   Such reargument has now been had, and, as a result, it seems necessary to reverse our former judgment.

The general principles governing the efficacy of judgments between parties and their privies were well stated in the former opinion, and we do not find it necessary to rediscuss or criticise them.   Those principles are there stated as follows: "In a second litigation between the same parties or privies upon the same cause of action the judgment is absolutely final as to their rights in that cause of action as to all things, not only those which were in fact litigated and decided by the court, but also those which might have been so litigated and decided.   On the other hand, in a subsequent litigation between the same parties or their privies upon a different cause of action the judgment is only conclusive as to those issues which were in fact adjudicated.  .  .  . To ascertain what those issues were, we may examine the proceedings, or extrinsic evidence may be considered."   In discussing the question of privity, however, the following language was used: "The conclusive effect of a judgment is against the parties thereto personally whenever the matter adjudicated again becomes material between them, *and that personal effect attaches itself to any property or rights of such individuals when brought into litigation, and follows such* •

Grunert vs. Spalding and others.

*property or rights into the hands of a grantee or transferee thereof."* We are all agreed that so much of the above paragraph as states that the effect of a personal estoppel follows *any* property or rights into the hands of a grantee or transferee of such property is incorrect, and must be withdrawn. It is only when the particular property or right which has been transferred is affirmatively shown to have been the subject matter of the former litigation, and its status settled thereby, that the effect of that litigation is conclusive upon a grantee or transferee of property. A mere personal estoppel does not travel with all property which the person estopped may afterwards transfer, but only with the property shown to have been in litigation, and afterwards transferred. *Hart v. Moulton, post,* p. 349. In the case just cited it is said: "The mere personal effect of the judgment is absolutely confined to the parties to the litigation. It does not attach to or become a rule of property as to any other thing than the particular subject of the controversy which was closed by the judgment." Granting, for the purpose of the argument, that the plaintiff here is in privity with Coleman, it seems very apparent, under the foregoing rules, that the evidence does not go far enough to show that the judgment in the case of *Fletcher v. Coleman* concludes the plaintiff, or in any way affects his title to the lands included in the first and second causes of action here. The present cause of action being an entirely different one from that involved in *Fletcher v. Coleman,* the judgment is only conclusive as to those issues which affirmatively appear to have been in fact adjudicated in that case. It nowhere appears, either by the record of that case or by extrinsic evidence, that it was there decided (as between Fletcher and Coleman) that the lands here involved were exempt from taxation, because it does not appear that Coleman then had, or claimed to have, any tax certificates upon these lands. His certificates, if he held any, may just as well have been upon

the lands described in Exhibit B, which are not involved in this action, and which appear to have never been adjudicated on at all. Perhaps, as to Coleman himself, the question was decided that the lands in Exhibit A were exempt from taxation, so that he would be personally estopped from contending to the contrary in subsequent litigation with Fletcher; but it does not appear that either the land in controversy here or any tax certificates on that land were the subject of controversy between Fletcher and Coleman in that case, and hence that judgment did not attach to any land so as to conclude one who subsequently purchased from Coleman. This consideration makes the estoppel raised by the former adjudication, if any there was, a mere personal estoppel as to Coleman, and one which is not attached to any property; and hence, when Coleman afterwards conveyed the Webster title to the plaintiff, it passed unaffected by the prior judgment. This conclusion is decisive of this branch of the case, because the parties in the present case by stipulation (now for the first time called specifically to our attention) have stipulated that, "if the plaintiff's title to the lands described in the first and second causes of action is found to be valid, he is entitled to recover for damages under said first and second causes of action the sum of ten thousand dollars." The parties having chosen to rest the right of recovery upon the question of title to the land on which the trespass was committed, we are relieved from considering the question whether Coleman, if personally estopped, could, by assignment, transfer a cause of action for trespass thereon which could be recovered upon in the hands of his assignee.

Another position was taken by the plaintiff, and argued, namely, that, even conceding that the judgment in the prior action estopped Coleman and his grantees, who claimed under a title founded on the certificates attacked in that action, still such estoppel could have no effect upon the Web-

ster title, which simply passed through Coleman to the plaintiff, and which is conceded to have been a good title, and one which is founded upon certificates of a subsequent year. In the view we have taken of the case, we have found it unnecessary to discuss this question.

*By the Court.*— Judgment affirmed.

CASSODAY, C. J., took no part.